# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,    )
    )
    Plaintiff,    )
    )
v.    )    Case No. CR-22-00239-JD
    )
DANIEL OCHOA and    )
KEVIN EARL TOOKS,    )
    )
    Defendants.    )

## ORDER

Before the Court is Defendants Daniel Ochoa and Kevin Earl Tooks' (collectively, "Defendants") Joint Motion to Suppress Evidence and Statements [Doc. No. 178], which the government timely opposed [Doc. No. 185]. A hearing was held on August 3, 2023.[1]

At the hearing, Mr. Ochoa personally appeared with his appointed counsel, Jeffery D. Trevillion, Jr., Miguel A. Figueroa, and Brian M. Self. Mr. Tooks personally appeared with his appointed counsel, Assistant Federal Public Defender Traci Lynn Rhone. The government appeared through Assistant United States Attorneys Wilson D. McGarry and Travis Leverett. The Court received the testimony of one witness: Oklahoma Highway

---

[1] At the hearing, counsel for Defendant Kevin Earl Tooks raised a discovery issue regarding numerous jail phone calls that were recently produced to Defendants by the government. Counsel made an oral motion to exclude these jail calls based on the timing of the government's production. Mr. Tooks has not sought any kind of continuance or even a brief delay of trial to review the calls, and counsel on behalf of Tooks announced at the pretrial conference that she was ready for trial. Nonetheless, the government has explained that it does not intend to offer any of these calls at trial. Therefore, the oral motion to exclude the jail calls is DENIED as moot without prejudice to reassertion at trial, if necessary.

Patrol ("OHP") Trooper Michael Eckhardt. The government submitted as evidence the previously submitted videos, which were conventionally filed of record at [Doc. Nos. 186 and 187], and portions of the videos were played during the hearing. The government also submitted other exhibits, which are attached to its Response [Doc. Nos. 185-1 through 185-16]. The Court has reviewed the videos in their entirety, which include the audio and video footage from the dashcam and the front passenger seat camera equipped on Trooper Eckhardt's patrol vehicle—both of which were recorded on May 17, 2022. At the hearing, Defendants offered two exhibits, an Incident Details Report for Trooper Eckhardt's traffic stop and messages exchanged between Trooper Eckhardt and OHP Trooper Brady Webb during the traffic stop. Upon consideration of the filings and evidence presented, and having reviewed the relevant law, the Court issues its ruling.

## I.    PROCEDURAL HISTORY AND BACKGROUND

Defendants are charged, along with two other co-defendants, in a two-count Indictment [Doc. No. 34] with Drug Conspiracy in violation of 21 U.S.C. § 846 and Possession of Fentanyl with Intent to Distribute in violation of 21 U.S.C. § 841(a)(1). In connection with Count 2, the Indictment also alleges the aiding and abetting statute, 18 U.S.C. § 2.

The charges stem from two traffic stops on Interstate 40 in Beckham County, Oklahoma on the evening of May 17, 2022. OHP Trooper Brady Webb stopped one vehicle driven by Ambrocio Arroyo, who was accompanied by Destiny Lopez. Almost immediately thereafter, a different trooper, Michael Eckhardt, stopped a vehicle driven by Daniel Ochoa, who was accompanied by Kevin Tooks.

Mr. Ochoa and Mr. Tooks seek an order suppressing all evidence from the cameras in Trooper Eckhardt's patrol vehicle and all derivative evidence obtained from Defendants' cell phones and jail calls.[2] They do not, however, move to suppress any of the physical evidence recovered from within the vehicle.

While Defendants initially conceded in their Motion that the traffic stop was justified at its inception, they reversed course at the hearing based on documents disclosed by the government shortly before the hearing. Defendants argue that the stop was not justified because it was pretextual in nature.[3] They also challenge the scope of the stop, arguing that Trooper Eckhardt unlawfully prolonged the traffic stop, and they contend that they were subjected to custodial interrogation without receiving warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). In response, the government asserts that the stop was justified at its inception because Trooper Eckhardt observed a speeding violation, that Trooper Eckhardt did not unlawfully prolong the traffic stop, and that Defendants were never subjected to interrogation.

---

[2] The Motion does not explain what comprises this derivative evidence. At the hearing, Defendants clarified that they consider the data from the cell phones seized from the Toyota Camry as derivative evidence.

[3] Defendants do not argue, however, that Trooper Eckhardt could not have observed a traffic violation.

II.    **FINDINGS OF FACT**[4]

On the evening of May 17, 2022, in Beckham County, Oklahoma, OHP Trooper

Brady Webb stopped a white Kia Forte driven by Ambrocio Arroyo, who was

accompanied by Destiny Lopez. Almost immediately thereafter, Trooper Michael

Eckhardt stopped a red Toyota Camry driven by Daniel Ochoa, who was accompanied by

Kevin Tooks. While the instant Motion relates to the traffic stop performed by Trooper

Webb, it mostly concerns the stop conducted by Trooper Eckhardt, who pulled Ochoa

over for speeding. Trooper Eckhardt[5] testified at the hearing and stated in his Report

[Doc. No. 185-2] that he "radar checked" Ochoa's speed at 80 miles per hour. The posted

speed limit was 75 miles per hour.

Trooper Eckhardt activated the lights on his patrol vehicle, and cameras on his

dashboard and inside his patrol vehicle began recording video and audio. The footage

---

[4] Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to "state its essential findings on the record" when deciding a motion that involves factual issues. These findings of fact shall serve as the Court's essential findings for purposes of Rule 12(d). The Court makes these findings under the authority of Rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to a search. *See United States v. Merritt*, 695 F.2d 1263, 1269–70 (10th Cir. 1982). In deciding such preliminary questions, the Federal Rules of Evidence, except those involving privilege, do not apply. *See* Fed. R. Evid. 104(a). Thus, the Court may consider hearsay in ruling on a motion to suppress.

[5] In making its factual findings, the Court notes for the record that based upon its observations at the hearing, the Court finds Trooper Eckhardt's testimony to be credible. *See, e.g.*, *United States v. Romero*, 247 F. App'x 955, 960 (10th Cir. 2007) (unpublished) (explaining that the "credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters most appropriate for resolution by the district court") (citation omitted).

from the dashcam and front passenger camera are attached to the government's Response
[Doc. No. 185-4 and 184-5]. Trooper Eckhardt can be heard at the outset of the video
saying that Ochoa was driving 78 miles per hour and "got up to 80," that Ochoa was
"kinda up and down," and that "80 [was] the fastest . . . ." Front Passenger Camera 0:33–
0:50.

    Although it is not always easy to discern what is being said, the cameras in the
patrol vehicle continued to record audio and video of the remainder of the traffic stop and
interaction between Defendants and OHP troopers. The sound inside the patrol vehicle
was captured for the entirety of the traffic stop and subsequent travel. At times, audio
from outside the patrol vehicle is also captured.

    After Mr. Ochoa pulled over to the side of the highway, Trooper Eckhardt
approached the vehicle from the passenger side. He asked Ochoa for his license and then
asked Ochoa to accompany him back to his patrol vehicle so he could complete a
warning. Trooper Eckhardt explained in his report, which is filed at [Doc. No. 185-2],
that he could "smell the odor of marihuana coming from within the vehicle" and could
see "marihuana residue on the interior." Eckhardt Report at 3–4.

    Once inside the patrol vehicle, Trooper Eckhardt began discussing the speeding
violation with Mr. Ochoa while he was processing the warning. Trooper Eckhardt asked
Ochoa where he and Tooks were headed. Mr. Ochoa explained that they were driving to
Atlanta, Georgia to see about buying some dogs. Eckhardt Report at 4; Front Passenger
Camera [Doc. No. 185-5] at 3:24–3:55. After Trooper Eckhardt asked, Ochoa explained

that he and Mr. Tooks would probably stay in Atlanta until Friday May 20, 2022 or Saturday May 21, 2022. Front Passenger Camera at 5:13–5:24.

At one point, Trooper Eckhardt realized that he had previously stopped Ochoa on another occasion, and Ochoa confirmed that Eckhardt had previously pulled him over. Eckhardt Report at 4; Front Passenger Camera at 4:15–5:04.

Then Trooper Eckhardt asked Ochoa who rented the vehicle. Ochoa told him that his friend Ambrocio rented it and added Ochoa as an additional driver. Eckhardt Report at 4; Front Passenger Camera at 5:58–6:54. This is consistent with the picture of the rental agreement attached to the government's Response [Doc. No. 185-10]. Trooper Eckhardt did not receive the rental agreement for the vehicle when Ochoa provided his license, so he exited the patrol vehicle to retrieve it from Mr. Tooks, who was still seated in the passenger seat of the Toyota Camry. Eckhardt Report at 4. Front Passenger Camera at 9:49–10:06.

Trooper Eckhardt asked Mr. Tooks to give him the rental agreement, and Tooks eventually located it. Eckhardt asked Tooks where he and Ochoa were traveling, and Tooks explained that they were headed to Georgia so he could buy a dog and would make "pit stops" in Tennessee. Dashcam [Doc. No. 185-4] at 10:14–10:49.

Once back inside the patrol vehicle with the rental agreement, Trooper Eckhardt continued to run computer checks and process the speeding violation. The rental agreement provided a return date of May 22, 2022 and a return location of Los Angeles, California. [Doc. No. 185-10]; Eckhardt Report at 4.

Trooper Eckhardt then told Mr. Ochoa he could smell marijuana in the vehicle and asked Ochoa whether he and Tooks had been smoking marijuana. Ochoa admitted to smoking but told Trooper Eckhardt that they had finished smoking before reaching Texas. Ochoa then told Trooper Eckhardt that he could "go ahead and check" the vehicle because there was "nothing[] there" that he and Eckhardt "need[ed] to have a conversation about." Front Passenger Camera at 13:32–14:00.

Before beginning the search of the Toyota Camry, Trooper Eckhardt directed Mr. Tooks to exit the vehicle, and he escorted Tooks back to the patrol vehicle. Tooks sat in the rear passenger-side seat of the patrol vehicle. Dashcam at 14:40–15:24. Trooper Eckhardt also checked Ochoa for any weapons. Front Passenger Camera at 15:24–15:41.

Trooper Eckhardt's Report explains that he received information from Trooper Brady Webb before conducting his search of the Toyota Camry. Eckhardt Report at 5. At the hearing, he explained that Webb communicated to him by sending him messages on his computer. According to the report, Webb advised Eckhardt that he found a large trafficking quantity of what Webb believed to be fentanyl pills inside the door panels of the Kia Forte. Eckhardt Report at 5.

Trooper Webb's Report, which is filed at [Doc. No. 185-1], summarizes the traffic stop and subsequent search of the Kia Forte. Troopers Eckhardt and Webb conducted the stops in substantially similar processes.

Trooper Eckhardt began the initial part of his search of the Toyota Camry, which lasted around 10 minutes. Dashcam at 16:19–26:50. The video shows that he received a

call after he began his search of the Toyota. Dashcam at 17:21–18:00. Trooper Eckhardt explained at the hearing that this call was from OHP Trooper Jake Sawatzky.

A few minutes into the search, Trooper Eckhardt was joined by Trooper Sawatzky, who helped him search the vehicle. Dashcam at 19:20–26:50. During the search, Mr. Ochoa and Mr. Tooks were left in the patrol vehicle by themselves. The cameras inside the patrol vehicle recorded their conversation.

The troopers then walked back to Eckhardt's patrol vehicle to place Defendants in handcuffs and inform them that they were being detained because they were in conspiracy with the other vehicle. They also explained that the Drug Enforcement Administration ("DEA") would come out to speak with them if they were interested. Trooper Sawatzky told Defendants that he would not read them *Miranda* warnings and that the troopers would be taking both vehicles and Defendants to the Sayre Police Department. Front Passenger Camera at 26:50–29:33.

The troopers then resumed their vehicle search and arranged for a wrecker to tow the Toyota Camry to the Sayre Police Department. The camera inside the patrol vehicle continued to record the conversation between Mr. Ochoa and Mr. Tooks. No one was present in the vehicle at this time other than Mr. Ochoa and Mr. Tooks.

Recovered from the Toyota Camry were three cell phones, tools that the troopers confirmed could be used to access the locations in the Kia Forte where the fentanyl pills were hidden, the rental agreement, and marijuana residue. Eckhardt Report at 3.

Defendants do not seek to exclude any of the physical evidence recovered from the vehicle. Instead, they seek an order suppressing the video evidence and all derivative evidence obtained from Defendants' cell phones and jail calls.

## III.   RELEVANT LAW AND ANALYSIS

### A. The traffic stop was justified at its inception due to Trooper Eckhardt's observation of a speeding violation.

Defendants assert that the traffic stop was unjustified at its inception because they argue it was pretextual. At the hearing, Defendants asserted this for the first time and asserted a new claim accusing the troopers of racial profiling. Based on the evidence at the hearing, Trooper Eckhardt witnessed a traffic violation. Thus, the traffic stop was justified at its inception.

The Fourth Amendment prohibits unreasonable searches and seizures by the government. U.S. Const. amend. IV. The touchstone under the Fourth Amendment is reasonableness. *See id.*

A traffic stop is a seizure under the Fourth Amendment "and is subject to review for reasonableness." *United States v. Mayville*, 955 F.3d 825, 829 (10th Cir. 2020). "To be reasonable, a traffic stop must be justified at its inception and, in general, the officer's actions during the stop must be reasonably related in scope to the mission of the stop itself." *Id.* (citations omitted). The Tenth Circuit has explained that "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th

Cir. 1995). And it is "irrelevant that the officer may have had other subjective motives for stopping the vehicle." *Id.* The sole inquiry here is whether these particular officers "had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction." *Id.* (quoting *Delaware v. Prouse*, 440 U.S. 648, 661 (1979)).

Further, the constitutionality of the stop does not depend on whether the driver did, in fact, commit a traffic violation. The standard is reasonable suspicion of wrongdoing. If an officer reasonably thinks he saw a driver commit a traffic infraction, then that is enough to pull him over. *See*, *e.g.*, *United States v. Reyes*, 202 F. Supp. 3d 1209, 1213 (D. Kan. 2016) (explaining that the "propriety of a stop does not depend on whether the suspect is actually guilty of committing a traffic offense; rather, the relevant question is whether it was reasonable for the officers to believe the offense had been committed") (citing *United States v. Eckhart*, 569 F.3d 1263, 1271 (10th Cir. 2009) and *United States v. Cashman*, 216 F.3d 582, 587 (7th Cir. 2000)).

Trooper Eckhardt observed Ochoa committing a traffic violation, having measured his speed at five miles per hour over the posted speed limit. Apart from arguing the stop was pretextual and the product of racial profiling, Defendants do not offer anything to refute or discredit the several statements that Eckhardt made that Ochoa was speeding, including the contemporaneous statements he made at the outset of the video, his statement in his written report, and his testimony at the hearing. Trooper Eckhardt's explanation for why he stopped Ochoa has remained consistent. His subjective motives, if any, are immaterial. *See Botero-Ospina*, 71 F.3d at 787; *see also Whren v. United States*,

517 U.S. 806, 813 (1996) (explaining that the constitutional reasonableness of traffic stops does not depend "on the actual motivations of the individual officers involved"); *Eckhart*, 569 F.3d at 1271–72 (explaining that if a police officer witnesses a traffic violation, then the traffic stop is justified at its inception); *United States v. Cook*, 25 F. Supp. 2d 1167, 1169 (D. Colo. 1998) ("[A] pretextual motive is irrelevant if there was a valid basis for stopping the vehicle in the first instance for a traffic or equipment violation.").

"Racially selective law enforcement violates this nation's constitutional values at the most fundamental level; indeed, unequal application of criminal law to white and black persons was one of the central evils addressed by the framers of the Fourteenth Amendment." *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1167 (10th Cir. 2003). As the Tenth Circuit has explained, "[r]acial profiling issues concerning the intentional discriminatory application of the law are the province of the Equal Protection Clause." *United States v. Flores-Olmos*, 438 F. App'x 713, 716 (10th Cir. 2011) (unpublished). But this Court notes, as did the Tenth Circuit in *Flores-Olmos*, "the Supreme Court's admonition that '[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.'" *Id.* (quoting *Wren*, 517 U.S. at 813).

Even were Defendants' claim of racial profiling a legally cognizable attack on Trooper Eckhardt's belief that Ochoa had committed a traffic violation, and thus on the validity of the traffic stop, Defendants have provided no evidence of racial profiling by the troopers. To prove such a charge, the Tenth Circuit requires defendants to

present evidence from which a jury could reasonably infer that the law
enforcement officials involved were motivated by a discriminatory purpose
and their actions had a discriminatory effect. To satisfy the discriminatory-
effect element, one who claims selective enforcement must make a credible
showing that a similarly-situated individual of another race could have
been, but was not, stopped or arrested for the offense for which the
defendant was stopped or arrested. And the discriminatory-purpose element
requires a showing that discriminatory intent was a motivating factor in the
decision to enforce the criminal law against the defendant. Discriminatory
intent can be shown by either direct or circumstantial evidence.

*United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006) (internal

quotation marks, citations, and alterations omitted). The basis for the argument that the

troopers racially profiled Defendants rests on the facts that Ochoa is a Hispanic male,

Tooks is an African American male, and the troopers are white men. Defendants offer no

direct or circumstantial evidence that the troopers were motivated by a discriminatory

purpose, nor do they attempt to make any showing that similarly-situated individuals of

another race could have been, but were not, stopped for speeding.

The traffic stop was based on a speeding violation observed by Trooper Eckhardt.

It was justified at its inception.

### B.  The traffic stop was not prolonged without at least reasonable suspicion of criminal activity.

Defendants contend that the traffic stop was prolonged without reasonable

suspicion of criminal activity. "It is well-established that, during a routine traffic stop, an

officer may request a driver's license and registration, run requisite computer checks, and

issue citations or warnings." *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir.

2015). An officer may also ask about the driver's travel plans, *United States v. Williams*,

271 F.3d 1262, 1267 (10th Cir. 2001), and ask about matters unrelated to the stop if those

questions do not prolong the length of the detention. *United States v. Stewart*, 473 F.3d 1265, 1269 (10th Cir. 2007). However, a lawful traffic stop may not extend beyond the time "reasonably required" to effectuate the purpose of the stop. *Rodriguez v. United States*, 575 U.S. 348, 357 (2015); *see also United States v. Moore*, 795 F.3d 1224, 1228 (10th Cir. 2015). Beyond that point, "[c]ontinued detention is lawful only if the encounter becomes consensual or if, during the initial lawful traffic stop, the officer develops a 'reasonable suspicion' that the detained person is engaged in criminal activity." *Pettit*, 785 F.3d at 1379 (citing *United States v. Bradford*, 423 F.3d 1149, 1156–57 (10th Cir. 2005) and *United States v. Rosborough*, 366 F.3d 1145, 1148 (10th Cir. 2004)).

Although the government bears the burden of proving the reasonableness of the officer's suspicion, "[r]easonable suspicion is not, and is not meant to be, an onerous standard." *United States v. Simpson*, 609 F.3d 1140, 1153 (10th Cir. 2010). "Reasonable suspicion requires 'considerably less' than a preponderance of the evidence and 'obviously less' than probable cause to effect an arrest." *Pettit*, 785 F.3d at 1379 (citing *United States v. Esquivel-Rios*, 725 F.3d 1231, 1236 (10th Cir. 2013)). To satisfy this standard, an officer is not required to "rule out the possibility of innocent conduct" or have evidence suggesting "a fair probability of criminal activity." *Esquivel-Rios*, 725 F.3d at 1236 (citations omitted). Rather, the officer must have a "particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citation omitted). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.*

(citations omitted). Further, the existence of objectively reasonable suspicion "'does not depend upon any one factor, but on the totality of the circumstances.'" *Simpson*, 609 F.3d at 1146 (quoting *United States v. Soto*, 988 F.2d 1548, 1555 (10th Cir. 1993)).

In deciding whether the government has met this burden, the Court defers "to an officer's ability to distinguish between innocent and suspicious actions"; thus, the "evaluation is made from the perspective of the reasonable *officer*, not the reasonable *person*." *Id.* at 1146–47 (citations omitted).

Here, since the reason Trooper Eckhardt pulled Ochoa over was for speeding, the "mission" of the stop was to issue a warning to Ochoa for a speeding violation, and the Fourth Amendment generally required that his actions reasonably relate to that mission. These would "include those steps necessary to issue a ticket or warning, and 'ordinary inquiries incident to the traffic stop,' such as 'checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.'" *United States v. Cates*, 73 F.4th 795, 805 (10th Cir. 2023) (quoting *Rodriguez*, 575 U.S. at 355). And as previously stated, Trooper Eckhardt could ask Ochoa about unrelated matters as long as those inquiries did not prolong the stop.

Up until Trooper Eckhardt asked Ochoa about the marijuana, there can be no dispute that his inquiries and actions related to the mission of the stop, or at least did not prolong the stop. Specifically, the Court finds that Trooper Eckhardt's questions relating to Ochoa's and Tooks' travel plans did not prolong the length of the stop because he asked them while he was working on processing the speeding violation. And the time it

took Trooper Eckhardt to obtain all the documentation from Ochoa and Tooks and run his computer checks was reasonable.

Courts sometimes refer to an officer's investigative detour during a traffic stop as a "*Rodriguez* moment." This is the moment when "the stop is prolonged such that reasonable suspicion was necessary." *United States v. Batara-Molina*, 60 F.4th 1251, 1255 n.1 (10th Cir. 2023). If there were such a moment in this case, it occurred when Trooper Eckhardt asked Ochoa about the odor of marijuana emanating from the vehicle because this question was not related to the speeding violation, and it did prolong the stop. The Court, however, questions whether *Rodriguez* even applies here because based on Trooper Eckhardt's observations when he first made contact with Ochoa and Tooks, he had probable cause to search the vehicle.

"Under the automobile exception to the Fourth Amendment's warrant requirement, 'police officers who have probable cause to believe there is contraband inside an automobile that has been stopped on the road may search it without obtaining a warrant.'" *United States v. Bradford*, 423 F.3d 1149, 1159 (10th Cir. 2005) (quoting *Florida v. Meyers*, 466 U.S. 380, 381 (1984) (per curiam)). The Tenth Circuit has repeatedly explained that the smell of marijuana alone is sufficient to establish probable cause to search a vehicle for the illegal substance. *United States v. Downs*, 151 F.3d 1301, 1303 (10th Cir. 1998) (holding that the strong smell of raw marijuana emanating from the defendant's vehicle at the time of the stop gave the officer probable cause to search the vehicle's trunk); *United States v. Vasquez-Castillo*, 258 F.3d 1207, 1213 (10th Cir. 2001); *United States v. Snyder*, 793 F.3d 1241, 1244 (10th Cir. 2015).

Eckhardt explained in his report that he could smell the odor of marijuana coming from within the vehicle and could see marijuana residue on the interior, and Ochoa explained that he and Tooks had previously smoked marijuana but had finished it before driving through Texas.

The Court finds Trooper Eckhardt's report and testimony that he smelled marijuana coming from the vehicle to be credible. And although Ochoa ultimately consented to search of the vehicle, Trooper Eckhardt's observations of the odor and presence of marijuana provided him probable cause to search the vehicle at the outset of the traffic stop.[6] *See United States v. Johnson*, 630 F.3d 970, 974 (10th Cir. 2010) ("Because the district court specifically found the trooper to be credible when he testified that there was a strong odor of burnt marijuana emanating from the car when he approached to question the passengers, we can find no error in the conclusion that probable cause was established to justify the search of the car.").

---

[6] At the hearing, Defendants argued that with the legalization of marijuana for medical use in Oklahoma, the odor of marijuana alone is no longer sufficient to provide a law enforcement officer probable cause to believe contraband is present in the vehicle and, thus, that the odor of marijuana no longer provides a basis for a warrantless search of a vehicle under the automobile exception. Defendants cite no authority for this argument. As far as the Court is aware, the Tenth Circuit has not yet spoken on this issue. But the Oklahoma Court of Criminal Appeals has, and it squarely rejected the very argument advanced by Defendants. *State v. Roberson*, 492 P.3d 620, 623 (Okla. Ct. Crim. App. 2021) ("The decriminalization of marijuana possession for those holding medical marijuana licenses in no way affects a police officer's formation of probable cause based upon the presence or odor of marijuana."). Further, given the proximity of the location where Trooper Eckhardt stopped Ochoa to the border between Oklahoma and Texas, time of night, and what Mr. Ochoa relayed to Trooper Eckhardt, it was reasonable for Trooper Eckhardt to not believe this to be legal marijuana possession and to believe that it was brought out of state into Oklahoma.

Defendants do not argue that Trooper Eckhardt could not have smelled the strong odor of marijuana or that he could not have seen the residue in his initial contact with them, but they point out that Trooper Eckhardt waited to mention anything about marijuana until just over 11 minutes into his conversation with Ochoa. They also make much of the fact that the troopers searched the vehicle for "nearly an hour." Motion at 9. But Defendants provide no explanation of the legal consequence of these facts.

To the extent that *Rodriguez* does apply here, the Court finds that Trooper Eckhardt had reasonable suspicion that Ochoa and Tooks were engaged in criminal activity based on the arguments made by the government and the evidence submitted, including Trooper Eckhardt's testimony. Reasonable suspicion of illegal activity—which is all that is required to justify the detention—is a lower bar than probable cause. *Valdez v. McPheters*, 172 F.3d 1220, 1227 n.5 (10th Cir. 1999).

So it follows that at the moment Trooper Eckhardt asked whether Ochoa and Tooks had been smoking marijuana in the vehicle, he had reasonable suspicion that Ochoa and Tooks were engaged in unlawful activity, specifically possession of marijuana, which is a Schedule I controlled substance under state and federal law. *See Roberson*, 492 P.3d at 623 ("In Oklahoma legal marijuana possession is limited to those holding medical marijuana licenses and the amounts are strictly circumscribed by statute and administrative rules.").

On top of that, Trooper Eckhardt also reasonably inferred that the travel plans provided by Ochoa and Tooks were suspiciously inconsistent with the listed return date on the car rental agreement. Eckhardt Report at 4. The Tenth Circuit has "consistently

held that implausible travel plans can contribute to reasonable suspicion." *Pettit*, 785 F.3d at 1381.

Ochoa explained that he and Tooks were on their way to Atlanta, Georgia so they could look at some dogs Tooks was interested in buying. Tooks likewise explained that they were headed to Georgia and were going to stop in Tennessee on the way. Ochoa told Trooper Eckhardt that they would stay in Atlanta "probably til Friday," or "probably til Saturday," but he then stated he did not know how long he and Tooks would be there. Friday would have been May 20, 2022, and Saturday would have been May 21, 2022. The rental agreement provided a return date of May 22, 2022 and a return location of Los Angeles, California. Although perhaps not technically impossible, it seems implausible that Ochoa could stay in Atlanta until Saturday and have the vehicle returned in Los Angeles the next day. While this would not be sufficient by itself to give rise to reasonable suspicion, it is a factor Trooper Eckhardt could consider.

At the hearing, Trooper Eckhardt testified that he and Trooper Webb were messaging each other on their computers about the traffic stops as Eckhardt was running his computer checks. He testified that Webb told him that Ambrocio Arroyo was the driver of the Kia Forte. Thus, the rental agreement of the Toyota Camry being executed by Mr. Arroyo was a fact that Trooper Eckhardt could take into account in his suspicion that Mr. Ochoa and Mr. Tooks were engaged in some criminal activity connected with the vehicle stopped by Trooper Webb.

To the extent that *Rodriguez* does apply, the Court finds that, based on the totality of the circumstances, the facts available to Trooper Eckhardt at the time he asked Ochoa

whether he and Tooks had been smoking marijuana would have warranted an officer of reasonable caution in believing that other illegal activity was occurring. Thus, Trooper Eckhardt was justified in prolonging the traffic stop.

### C. Defendants have not shown they were subject to custodial interrogation such that *Miranda* warnings were required.

Defendants allege violations to their Fifth Amendment rights because they were not provided with *Miranda* warnings. "*Miranda* warnings only need to be given once a suspect is in 'custody' and faces questioning that constitutes 'interrogation.'" *United States v. Cortez*, 965 F.3d 827, 840 (10th Cir. 2020) (quoting *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008)). "An individual is in custody when a reasonable person in the suspect's position would understand his or her situation as the functional equivalent of formal arrest." *Id.* The Supreme Court and the Tenth Circuit have clarified that investigatory detentions such as ordinary traffic stops generally fall short of placing the detainee in custody. *Id.*; *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984).

Defendants argue that Ochoa was in custody when Trooper Eckhardt directed him to sit in the patrol vehicle since Trooper Eckhardt testified that Ochoa was not free to leave. In a case presenting similar circumstances—a trooper asking a driver to exit his car and sit in the patrol vehicle without using handcuffs, weapons, or any other show of force to effectuate the stop—the Tenth Circuit held that even though the driver and his passengers "were not free to leave, the level of force used to effectuate the stop was not so intrusive as to transform an investigative detention into a custodial interrogation that

would require *Miranda* warnings." *United States v. Raynor*, 108 F. App'x 609, 614 (10th Cir. 2004) (unpublished).

Likewise here, Defendants were not in custody for the traffic stop portion of this encounter. Nothing about the circumstances up until the vehicle search suggest anything beyond an ordinary *Terry* stop occurred. Neither Mr. Ochoa nor Mr. Tooks was placed in handcuffs, and while Ochoa was in the front seat of the patrol vehicle, Trooper Eckhardt merely spoke to him as he was processing the speeding violation and running computer checks. A reasonable person would not have understood this situation to be the functional equivalent of a formal arrest.

The government concedes that Mr. Ochoa and Mr. Tooks were in custody once the troopers placed them in handcuffs. Trooper Eckhardt testified at the hearing that he arrested Defendants at this point. Thus, at that point, the troopers needed to provide *Miranda* warnings before Ochoa and Tooks could be subjected to interrogation. *United States v. Eckhart*, 569 F.3d 1263, 1275 (10th Cir. 2009).

"'[I]nterrogation' refers to 'either express questioning or its functional equivalent'—i.e., 'words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Cash*, 733 F.3d 1264, 1277 (10th Cir. 2013) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980)). A question from an officer is neither sufficient nor necessary. The inquiry is "whether law enforcement officials should have known that their words or actions—whether framed as a question or not—were reasonably likely to elicit an incriminating statement." *Id.* An

"incriminating response" is "any response—whether inculpatory or exculpatory—that the prosecution may seek to introduce at trial." *Innis*, 446 at 301 n.5 (emphasis omitted). The Court "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Id.* at 301.

In their Motion, Defendants point to one statement they claim was made by Trooper Eckhardt after or as they were being placed in handcuffs. As clarified at the hearing, this statement was made by Trooper Sawatzky. After placing Ochoa and Tooks in handcuffs and back into the patrol vehicle, Trooper Sawatzky stated:

> Okay, there's another car that's back here that's traveling in tandem with you guys. That thing's loaded with fentanyl pills. So, here's the deal, we have seen multiple of these vehicles—they're called decoy, like a lead/follow type of deal—and you guys are in conspiracy with that vehicle. And we believe there is trafficking quantities of suspected fentanyl pills, the M30s, the blue M30s. So you're detained at this point. So here's what we do from this point on, okay, and you guys need to think about this. Okay, so what we do anytime we find bulk narcotics, bulk currency, anything that's of trafficking quantities, okay, significant value, we always call the DEA. The DEA is basically the investigative division that we call. They do all our follow-up on our large-scale seizures. Okay, so if you guys are interested in speaking with them, that option's gonna be out there for you. And if they come out, what they're gonna wanna, they're gonna wanna know the who, what, when, where, why, how. But that's gonna be your opportunity to help yourself if you choose. We're not reading you *Miranda* at this time. But that's just something we're gonna throw out there while we make our calls and finish processing the vehicle. Okay, so what we're gonna do is we're gonna take everybody in both vehicles back to the police department, and we're gonna conduct secondary searches or continue our searches at that location. Okay, so if there's anything you guys need, wanna think about, wanna talk about, you guys feel free, and then we'll get back with you here in a minute.

Front Passenger Camera at 27:48–29:31.

Defendants argue this statement constitutes interrogation. The Court disagrees. All the trooper was doing was explaining to Defendants why they were being detained and what would happen next. This is not a statement that any law enforcement officer would know is reasonably likely to elicit an incriminating statement. It does not appear that the trooper was looking for *any* response from Defendants. This is purely informational. Therefore, Defendants were not subject to custodial interrogation at this point.

As for any other statement made by Defendants after Trooper Sawatzky's explanation for why they were being detained and what would happen next, including in Defendants' conversation in the patrol vehicle, Defendants have not shown how *Miranda* is implicated.

The Tenth Circuit has explained that there is no reasonable expectation of privacy for communications while in a law enforcement vehicle.[7] *United States v. Turner*, 209 F.3d 1198, 1200–01 (10th Cir. 2000). Defendants point to nothing coercive about the troopers' words or actions that was likely to elicit incriminating statements from Defendants after they were left together in the patrol vehicle. "*Miranda* itself recognized that '[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.'" *United States v. Pettigrew*, 468 F.3d 626, 635 (10th Cir. 2006) (quoting *Miranda*, 384 U.S. at 478).

---

[7] Further, it appears that the front passenger door window may have been at least partially lowered for some of the time Defendants were in the patrol vehicle. *See* Front Passenger Camera at 51:00–51:58.

Even if Defendants had established a *Miranda* violation occurred, it would not necessarily mean that all subsequent statements of Defendants are suppressed as fruits of the poisonous tree. The Tenth Circuit has explained that while an "unwarned confession taken in violation of *Miranda* must be suppressed . . . it does not necessarily follow that every subsequent voluntary statement made by a suspect must be suppressed as well." *Pettigrew*, 468 F.3d at 635. "[T]he admissibility of an unsolicited inculpatory statement, following a voluntary statement made in violation of *Miranda,* turns on whether the inculpatory statement was knowingly and voluntarily made." *Id.* at 636.

Defendants' conversation in the patrol vehicle was entirely voluntary and unsolicited by the troopers. And their statements in that conversation were volunteered, not the product of interrogation. These circumstances do not implicate the concern that the "possibility of coercion inherent in custodial interrogations unacceptably raises the risk that a suspect's privilege against self-incrimination might be violated," which was the basis for the *Miranda* decision. *United States v. Patane*, 542 U.S. 630, 639 (2004). Thus, to the extent that Defendants are arguing that the conversation should be suppressed under the fruits of the poisonous tree doctrine because of a prior *Miranda* violation, the Court finds that their argument should be rejected.

Because the statements in the patrol vehicle appear to have been the result of a free and unconstrained choice by Mr. Ochoa and Mr. Tooks, the Court will not suppress them.

23

IV.     **CONCLUSION**

For these reasons, the Court DENIES Defendants Daniel Ochoa and Kevin Earl

Tooks' Joint Motion to Suppress Evidence and Statements [Doc. No. 178]

IT IS SO ORDERED this 4th day of August 2023.


JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE